UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 20 CR 564 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| RONALD R. MURRAY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Ronald Murray is charged by indictment with possessing a firearm after having been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). Doc. 1. Murray moves to suppress all evidence seized or derived from his seizure and arrest on July 27, 2020 as the fruits of an unlawful *Terry* stop and frisk. Doc. 17; *see Terry v. Ohio*, 392 U.S. 1 (1968). Pursuant to Criminal Rule 12(d), the court states its findings of fact and conclusions of law. Murray's motion is denied because the stop and the frisk were lawful.

**Findings of Fact**

What follows is a description of the evidence submitted with the parties' briefs, Docs. 17, 20, 21, and presented at an in-court evidentiary hearing, Doc. 26. In summarizing the evidence and then making findings of fact, the court considers the video and documentary evidence, as well as the testimony and demeanor of the witnesses who testified at the hearing: Officer Jason Davis and Officer Gabriel Garcia of the Chicago Police Department ("CPD").

Officer Davis testified as follows. Since December 12, 2016, Officer Davis has served as a CPD officer. In July 2020, he was working as a tactical team officer in the Seventh District, a position he had held for over three years. The focus of Officer Davis's work was to police gang

1

and gun violence on the South Side. While performing his duties, Officer Davis would encounter individuals unlawfully carrying concealed firearms. Based on his experience, he knew of several indicators of unlawful concealed firearm possession, including that the individual: (1) was acting "evasive[ly]" when encountering an officer; (2) had a "suspicious," L-shaped bulge that was non-uniform to the individual's body; and (3) performed a "security check" by patting down the area holding an uncased firearm to make sure it was secure.

On the evening of July 27, 2020, Officer Davis was on "general patrol" duty with his partner, Officer Garcia. They were riding in an unmarked squad car, each in full uniform and wearing a body camera. Def. Exh. A (Officer Davis's body camera footage); Def. Exh. B (Officer Garcia's body camera footage). At 11:30 p.m., the officers were driving through the Englewood neighborhood when they happened upon a party on the 2100 block of 71st Street. Officer Davis knew the area to be "high" in "gun and gang violence." His testimony on that point is corroborated by the City of Chicago's "Gun Crimes Heat Map," which flags the 2100 block of 71st Street as a hotspot of criminal activity. Govt. Exhs. 3, 4.

Upon arriving at the scene, Officer Davis heard loud music and detected the odor of cannabis. The street was well-lit. From his patrol car, Officer Davis saw several individuals drinking from clear plastic cups, which he took as "an indicator of drinking alcohol." He exited his vehicle to investigate and "immediately observed the defendant [Murray] in [his] line of sight." Murray was wearing a white t-shirt, white pants, and black underwear. Def. Exh. A at 23:31:10. A "large bulge" in Murray's "left front pants pocket" piqued Officer Davis's interest. Officer Davis testified that he first observed the bulge while standing outside his vehicle, next to the driver's side door. In Officer Davis's recollection, Murray was at that point standing on the

sidewalk a few yards away from him, with his "left leg facing [Officer Davis's] direction." *Ibid*. Officer Davis had a "direct line of sight to [Murray's] left front pocket" from that angle.

According to Officer Davis, Murray "looked in [his] direction and began to walk away." Based on Murray's behavior and his observation of the bulge, Officer Davis began to believe that Murray was armed with an illegal firearm. Officer Davis accordingly "focused" his attention on Murray instead of the other partygoers. Still on foot, Officer Murray continued up the street while Murray cut through the sidewalk, with both walking toward a staircase leading to the front door of the residence at 2110 West 71st Street. *Id*. at 23:31:12-18. When approaching Murray, Officer Davis saw him perform a security check on his front left pocket area.

Officer Davis's and Murray's paths converged near the bottom of the staircase, where several other individuals had clustered. *Id*. at 23:31:18. Officer Davis and Murray were separated by only a few feet at that point. Shining his flashlight at close distance, Officer Davis was able to make out the "L shape" of what he believed to be a firearm in Murray's front left pocket. With the distance between them closing, Murray asked, "Everything cool, officer?" *Id*. at 23:31:17-18. Officer Davis replied, "Yeah, what y'all moving for?" *Id*. at 23:31:18-20. Hearing no response, Officer Davis repeated, "Chill. Chill. Chill. What you moving like that for?" *Id*. at 23:31:20-24. Murray responded, "Whoa, I've been walking all day," as he ascended the stairs. *Id*. at 23:31:24-25.

As Officer Davis followed Murray up the stairs, he noticed that the L-shaped object in Murray's front left pocket was "swaying" back and forth. The "swaying" motion that Officer Davis described in his testimony is visible in his body camera footage as Murray climbs the top three steps. *Id*. at 23:31:25-27. Given his experience, Officer Davis believed "the weight of the object [to be] consistent with a loaded firearm."

3

Now near the top of the stairs, Officer Davis asked Murray if he had anything on his person. Murray said no. Officer Davis believed that answer to be a lie based on the shape and weight of the object in Murray's front left pocket. Officer Davis testified that, given the totality of what he had observed—*i.e.*, the characteristics of the object, Murray's remarks and efforts to move away from him, and the fact that they were in a high-crime area—he formed a "reasonable suspicion" that Murray was trying to conceal an illegal firearm.

Officer Davis became concerned for his safety and that of the other officers and individuals around him, so he decided to stop Murray and frisk him for weapons. As Murray walked through the residence's front door, Officer Davis wrapped his arms around Murray's waist in order to seize him and pat down his front left pocket. *Id*. at 23:31:29-32. While patting Murray down, Officer Davis felt what he knew to be a firearm in Murray's front left pocket.

Following a struggle inside the residence, Officer Davis and the other officers recovered a loaded firearm from underneath Murray's body. Murray was placed under arrest and transported in a police vehicle. Def. Exh. C (arrest report); Govt. Exh. 5 (incident report). In a subsequent search of the police vehicle, officers found a bullet from the seized firearm in the area where Murray had been sitting. *Ibid*. The parties stipulated at the evidentiary hearing that, on July 28, 2020, Murray admitted to police that he knowingly possessed the firearm that officers recovered from him the prior evening.

Officer Davis prepared three written reports about his July 27 encounter with Murray: (1) an arrest report, Def. Exh. C; (2) an investigatory stop report, Govt. Exh. 1; and (3) an incident report, Govt. Exh. 5. The reports closely track Officer Davis's hearing testimony, apart from two matters highlighted by Murray. First, by stating that Murray was on the *street* when Officer Davis first saw him, the incident report contradicts Officer Davis's testimony—which is

confirmed by the video evidence, Def. Exh. A at 23:31:10, and consistent with the investigatory stop report and arrest report—that Murray was standing on the *sidewalk* when Officer Davis first saw him. *Compare* Govt. Exh. 5 (incident report asserting that Murray was "initially standing on the street with a bulge in his left pocket that resembled a firearm"), *with* Govt. Exh. 1 (investigatory stop report asserting that Murray was "standing on the sidewalk"), *and* Def. Exh. C (arrest report asserting the same). Second, the reports do not mention that the 2100 block of 71st Street is a high-crime area, which Murray argues is problematic because the investigatory stop report on its face requires officers to "include *all* factors that support [r]easonable [a]rticulable [s]uspicion … to justify the stop[] … [and] the [p]rotective [p]at [d]own." Govt. Exh. 1 (emphasis added).

Those minor discrepancies do not provide any plausible basis to doubt the accuracy or credibility of Officer Davis's testimony. True, it would have been better for Officer Davis to have referenced in his reports that the 2100 block of 71st Street is in a high-crime area. But the court finds credible his explanation that the reports are "generally used as a summary of the most important factors in regards to making a stop and making an arrest," and that he "fe[lt] comfortable" doing that for the investigatory stop report because he knew that his encounter with Murray was "fully captured on body-worn camera." The minor factual deviation between his testimony and *one* of the three reports as to where Murray was standing when Officer Davis first saw him is immaterial, particularly given that the other two reports and the body camera video accord with his testimony.

The court observed Officer Davis testify and finds his testimony to be highly credible. His body camera footage bolsters this conclusion, as it generally corroborates his account of the events, with two possible exceptions: (1) it is not readily apparent from the footage that the

5

"bulge" Officer Davis observed in Murray's front left pocket was gun-shaped; and (2) the "security check" that Officer Davis observed Murray perform is not readily apparent on video. But the footage, while quite good, may not capture entirely all the subtleties of what somebody on the scene could have observed, particularly somebody with the law enforcement training and experience that the court does not have. Moreover, Officer Davis's demeanor on the stand confirms, in the court's view, the veracity of his testimony that the bulge he observed was L-shaped and that he observed Murray performing a security check. And while it is unnecessary to do so, the court adds for good measure that confirmation also comes from the fact that Officer Davis contemporaneously memorialized his observations in writing. Def. Exh. C (arrest report asserting that Officer Davis believed that "a bulge in [Murray's] left pocket" "was a firearm based on [his] training and experience," and that "Murray briefly grabbed the object in his pocket and attempted to flee up the front porch of 2110 W 71st Street"); Govt. Exh. 1 (investigatory stop report documenting Officer Davis's observation of a "gun shaped bulge in [Murray's] left pocket); Govt. Exh. 5 (incident report stating that the bulge "resembled a firearm" and that Murray "briefly grabbed at [the] object").

Officer Garcia testified that he was not following Murray; that he did not get a clear look at Murray's front left pocket; and that he did not learn of the firearm in Murray's possession until Officer Davis frisked him. Given their respective roles in the underlying events, Officer Garcia's testimony is far less material than Officer Davis's testimony.

## Conclusions of Law

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. As a general rule, searches and seizures are unreasonable unless conducted pursuant to a warrant issued by a neutral magistrate after finding probable cause. *See Illinois v. McArthur*,

6

531 U.S. 326, 330 (2001). Law enforcement officers, however, can conduct reasonable searches and seizures without a warrant if the facts and circumstances fit certain recognized "exceptions" to the warrant requirement. *Id*. at 330-31. The Government bears the burden of establishing by a preponderance of the evidence that a warrantless search or seizure is justified under one of those exceptions. *See United States v. Basinski*, 226 F.3d 829, 833 (7th Cir. 2000).

One such exception holds that an officer may stop and investigate an individual if the officer reasonably suspects that "criminal activity may be afoot." *Terry*, 392 U.S. at 21, 30-31. And if, after conducting such a stop, the officer has a reasonable suspicion that "the person[] with whom he is dealing may be armed and presently dangerous," the officer may "conduct a carefully limited search of the outer clothing" for weapons. *Id*. at 30-31. "It is precisely because a frisk is more intrusive than a stop that the Fourth Amendment compels this additional armed-and-dangerous inquiry." *United States v. Howell*, 958 F.3d 589, 598 (7th Cir. 2020).

"Reasonable suspicion exists when an officer can point to 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion.'" *United States v. Richmond*, 924 F.3d 404, 411 (7th Cir. 2019) (quoting *Terry*, 392 U.S. at 21). The requisite level of suspicion is "more than a hunch but less than probable cause and 'considerably less than preponderance of the evidence.'" *Ibid*. (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). Reasonable suspicion is an "objective" standard that "turns on the totality of the circumstances confronting the officer." *United States v. Patton*, 705 F.3d 734, 738 (7th Cir. 2013). Pertinent circumstances include the officer's training and experience, *see United States v. Arvizu*, 534 U.S. 266, 273 (2002) ("[T]h[e] process [of making a determination of reasonable suspicion] allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that

7

might well elude an untrained person.") (internal quotation marks omitted); *United States v. Tinnie*, 629 F.3d 749, 752 (7th Cir. 2011) ("[Officer] Kaiser was part of a Special Focus Unit charged with patrolling higher crime areas and, as the district court found, was thus familiar with the risk of gun possession in that area."), the suspect's presence in a high-crime neighborhood, *see Richmond*, 924 F.3d at 411-12 (holding that the suspect's "presence in a neighborhood beset by drug trafficking and gun violence" "is among the relevant contextual considerations in a reasonable suspicion analysis"), and the suspect's demeanor and behavior, *see United States v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006) ("When determining whether an officer had reasonable suspicion, courts examine the totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect.").

The parties agree on several matters. First, Murray was "seized" within the meaning of the Fourth Amendment when Officer Davis wrapped his arms around Murray's waist as he tried to enter the residence. Doc. 17 at 6; Doc. 20 at 4, 7; *see United States v. Griffin*, 652 F.3d 793, 798 (7th Cir. 2011) ("[A]n officer's application of physical force always constitutes a seizure[.]"). Second, the frisk—Officer Davis's pat-down of Murray's front left pocket—occurred essentially simultaneously with the stop. Doc. 17 at 6; Doc. 20 at 4, 7. Third, if the stop or frisk were unlawful, the principal inculpatory evidence (the firearm, the bullet found in the police vehicle, and Murray's post-arrest statements) must be suppressed. Doc. 21 at 2 n.1.

The parties disagree on whether Officer Davis had reasonable suspicion to believe that "criminal activity [was] afoot," thereby justifying his seizure of Murray, or that Murray was "armed and presently dangerous," thereby justifying the frisk. Doc. 17 at 6 (quoting *Terry*, 392

8

U.S. at 30). Murray offers two arguments as to why Officer Davis did not have the requisite reasonable suspicion. Neither is persuasive.

First, Murray contends that Officer Davis did not have an objectively reasonable basis to believe that he was carrying a gun. Doc. 17 at 8; Doc. 21 at 1; Doc. 26. In support, Murray submits that a gun is not "clearly visible" in Officer Davis's body camera footage, and therefore that Officer Davis could not have *reasonably* believed that the bulge he saw was a firearm rather than a cell phone or a pack of cigarettes. Doc. 17 at 8. The problem with this argument is that the reasonable suspicion standard "does not deal with hard certainties," but rather with "common sense conclusions about human behavior." *United States v. Cortez*, 449 U.S. 411, 418 (1981); *see also Terry*, 392 U.S. at 27 (emphasizing that the "officer need not be absolutely certain that the individual is armed" to perform a frisk). Furthermore, as noted, "officers [are permitted] to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Arvizu*, 534 U.S. at 273 (internal quotation marks omitted).

Evaluated in accord with the governing legal principles, Officer Davis's suspicion that Murray had a gun was objectively reasonable. Officer Davis credibly testified that, when he came within feet of Murray at the bottom of the staircase, he was able to see that the object in Murray's front left pocket was "L-shaped." Officer Davis also described (and his body camera footage shows) how the object loosely swung around Murray's left leg while he ascended the stairs, tugging on his trousers. Def. Exh. A at 23:31:25-27. Drawing on his experience, Officer Davis concluded that the object was a firearm based on its size, shape, and weight. That was a reasonable conclusion, grounded in Officer Davis's experience and "common sense." *Cortez*, 449 U.S. at 418.

9

Second, Murray argues that Officer Davis, even assuming he reasonably believed that he was carrying a concealed firearm, did not have grounds to reasonably suspect that his concealed possession of a firearm was unlawful. Doc. 17 at 8-11; Doc. 21 at 11-15; Doc. 26. True enough, "a mere possibility of unlawful use of a gun is not sufficient to establish reasonable suspicion." *United States v. Watson*, 900 F.3d 892, 896-97 (7th Cir. 2018) (internal quotation marks omitted) (holding that a child's 911 call reporting that "boys" were "playing with guns" in a high-crime area was not itself sufficient to establish reasonable suspicion because "'[b]oys' could be a generic term for men of any age, and 'playing with guns' could mean displaying them, which is not criminal conduct"). That point holds true for concealed firearm possession, which the Seventh Circuit has held is a right protected by the Second Amendment. *See Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012). Moreover, and pertinent here, the Seventh Circuit has emphasized that "[p]eople who live in rough neighborhoods may want and, in many situations, may carry guns for protection. They should not be subject to more intrusive police practices than are those from wealthy neighborhoods." *Watson*, 900 F.3d at 897.

These principles do not win the day for Murray. As to the seizure, three circumstances faced by Officer Davis grounded a reasonable suspicion that Murray was illegally carrying a firearm: (1) after Murray saw Officer Davis, he turned away, cut through the sidewalk, and patted down the "bulge" in his front left pocket, which Officer Davis credibly testified is a "security check" technique used by persons unlawfully carrying uncased firearms; (2) Murray responded evasively to Officer Davis's questions—*i.e.*, when asked why he was moving, he stated, "Whoa, I've been walking all day"—and falsely denied having anything on his person; and (3) Murray was stopped around 11:30 p.m. in a neighborhood plagued with gangs and gun violence. *See Richmond*, 924 F.3d at 411-12 (holding that officers had reasonable suspicion to

stop and frisk the defendant because they were in a "neighborhood beset by drug trafficking and gun violence" at night and the defendant had a "significant bulge" in his shirt pocket and acted evasively upon seeing police—*i.e.*, the defendant "quickened his pace, changed his direction, cut across a property, and hid what [officers] suspected was a gun"); *Cady v. Sheahan,* 467 F.3d 1057, 1061-62 (7th Cir. 2006) (upholding a stop and frisk where the defendant "was evasive in response to the officers' questions" and "repeatedly reached into his briefcase"). As to the frisk, "[w]hat matters is whether a reasonable police officer, faced with the circumstances confronting [Officer Davis], would [have] believe[d] that [Murray] posed a danger to those in the immediate vicinity." *Patton*, 705 F.3d at 738. Given the circumstance described above, a reasonable officer would have been justified in this belief. *See United States v. Oglesby*, 597 F.3d 891, 893-95 (7th Cir. 2010) (holding a frisk justified because it "occurred at night in a location that was known to the officers to be a high-crime area plagued by drug trafficking and gun violence," the defendant moved away from the crowd as officers approached, and he lowered his hand to his pants pocket in an apparent effort "to confirm that his gun [was] concealed and secured").

Murray retorts that each circumstance on its own may be suggestive of purely innocent conduct. Doc. 17 at 10; Doc. 21 at 11-15. He also suggests that Officer Davis could not have ruled out that he was acting lawfully without first asking him, point blank, whether he had a concealed-carry permit. Doc. 17 at 2; Doc. 21 at 16. These "points miss the forest for the trees: when evaluating the reasonableness of a police intrusion, [a court must] look at the totality of circumstances and must not be overly focused on any one factor." *Richmond*, 924 F.3d at 411 (internal quotation marks omitted). Here, for the reasons just given, the totality of the circumstances demonstrates that Officer Davis reasonably suspected that Murray was illegally carrying a gun.

**Conclusion**

The court finds by a preponderance of the evidence that Officer Davis had reasonable suspicion to stop and frisk Murray based on the totality of circumstances before him. In view of his training and experience as a Seventh District tactical team officer, Officer Davis had a reasonable, objective basis for believing that Murray was not only unlawfully armed, but also a danger to the safety of officers and others around him. Because Officer Davis did not violate Murray's Fourth Amendment rights, his motion to suppress is denied.

July 12, 2021 _____
United States District Judge